N.N. a/n/f of A.B., Appellant,

v.

The INSTITUTE FOR REHABIL-
ITATION AND RESEARCH,
Appellee.

No. 01–02–01101–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Dec. 7, 2006.

Helen A. Cassidy, Storey, Moore & McCally, P.C., Daryl L. Moore, Moore & Kelly, P.C., Robert D. Green, Robert D. Green & Associates, P.C., Houston, TX, for Appellant.

Kurt T. Nelson, McCormick, Hancock & Newton, Murry B. Cohen, Akin Gump Strauss Hauer & Feld L.L.P., Cathy A. Shannon, Houston, TX, for Appellee.

Panel consists of Justices NUCHIA, JENNINGS, and ALCALA.

### OPINION ON REHEARING

ELSA ALCALA, Justice.

Appellant, N.N., as next friend of A.B., her daughter, has filed a motion for rehearing and for en banc reconsideration of our opinion issued on July 21, 2005. Appellee, the Institute for Rehabilitation and Research (TIRR), has responded to both motions. On February 22, 2006, we granted N.N.'s motion for rehearing. We now withdraw our opinion and judgment of July 21, 2005, and issue the following opinion and accompanying judgment in their stead.

N.N. sued TIRR, a health-care provider, pursuant to former article 4590i of the Medical Liability and Improvement Act (hereinafter "former article 4590i"),[1] for damages arising from the sexual assault of A.B. while hospitalized at TIRR. In response to a general negligence question and standard predicated damage questions, the jury found TIRR negligent and awarded A.B. $300,000 for mental anguish that she sustained in the past and $625,000 for mental anguish that, in reasonable probability, she would sustain in the future. On TIRR's motion, the trial court set aside the $625,000 award for future damages and rendered judgment notwithstanding the verdict (JNOV). In addition, the trial court signed an order suggesting a remittitur on the jury's award of $300,000 for past mental anguish, whereupon the parties settled, and the trial court signed a take-nothing judgment on all claims.

In her sole issue on appeal, N.N. challenges the JNOV rendered on the issue of damages for future mental anguish. In response, TIRR defends the JNOV as correct, on the grounds that no evidence supports a finding of compensable damages for future mental anguish. In addition, but only if we sustain N.N.'s single issue, TIRR asserts two cross-points. In its first cross-point, TIRR contends that the evidence is factually insufficient to show either that A.B. would, in all reasonable probability, experience mental anguish in the future or that she would sustain damages of $625,000 for that anguish. In its second cross-point, TIRR asserts that the evidence is factually insufficient to show that TIRR's negligence proximately caused the occurrence, and that the great weight and preponderance of the evidence establishes that TIRR met the standard of care and was not negligent in treating and observing "Mr. B.," who assaulted A.B. TIRR further contends, within these cross-points, that the trial court, and not this Court, should address TIRR's factual sufficiency complaints and thus challenges the constitutionality of settled Texas precedent, as stated in *Jackson v. Ewton*, 411

---

1. *See* Tex.Rev.Civ. Stat. Ann. art. 4590i, § 13.01(e), (r)(6) (Act of May 30, 1977, 65th Leg., R.S., ch. 817, §§ 1.01–12.01, 1977 Tex. Gen. Laws 2039–53, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884) (current version at Tex. Civ. Prac. & Rem.Code Ann. § 74.351(b)(2), (r)(6) (Vernon 2005)); *see also Garland Cmty. Hosp. v. Rose*, 156 S.W.3d 541, 543 n. 2 (Tex.2004) (noting codification of former article 4590i).

S.W.2d 715, 718–19 (Tex.1967), and rule 324(c) of the Texas Rules of Civil Procedure and rule 38.2(b)(1) of the Texas Rules of Appellate Procedure. *See* Tex.R. Civ. P. 324(c); Tex.R.App. P. 38.2(b)(1).

We conclude that the trial court erred by rendering JNOV in TIRR's favor because the evidence is legally sufficient to show that A.B. would, in all reasonable probability, experience compensable mental anguish in the future to support the $625,000 award. We further conclude that factually sufficient evidence supports the jury's award of $625,000 for A.B.'s future mental anguish and the jury's finding that TIRR's negligence proximately caused the occurrence. We also reject TIRR's contention that the great weight and preponderance of the evidence shows that TIRR did not deviate from the standard of care in treating and observing Mr. B. and therefore was not negligent. Lastly, we reject TIRR's constitutional challenges. Accordingly, we reverse the JNOV and render judgment reinstating the jury's award of $625,000 for A.B.'s future mental anguish.

### Facts and Procedural History

When she was 18 years old, A.B. sustained a serious brain injury in a June 6, 1997, automobile accident that also resulted in her sister's death. A.B. was in a coma after the accident and was still in a coma when surgery was performed to remove the right frontal and right temporal lobes of her brain. On July 2, 1997, she was transferred to TIRR, where she emerged from her coma and began receiving rehabilitation therapy for her brain injury. She was transferred briefly to another facility, but returned to TIRR on August 22, 1997.

On August 21, 1997, the day before A.B. returned to TIRR, a male, brain-damaged patient in his early 30's was admitted to the same third-floor unit as A.B. Because of the known propensity of brain-injured patients to wander and become disoriented, access to this floor was restricted. The patient, Mr. B., occupied the room across the corridor from A.B.'s room. Both rooms were the closest possible to the nurse's station for that area.

On the evening of August 30, 1997, A.B. was in her room and in bed. Her bed was a "modular box bed," which consisted of a mattress on the floor surrounded by a three and one-half foot wall, or railing. She was given a suppository medication to facilitate a bowel movement, and her diaper was left open with a protective pad placed beneath her pelvis, according to standard nursing practice that facilitated cleaning the patient. When A.B. was observed having a bowel movement at about 9:00 p.m., a nurse closed the door to A.B.'s room to permit her privacy, also according to standard nursing practice. Shortly after 9:00 p.m., and about when A.B. was due to be checked and cleaned, a nurse saw Mr. B. walking away from A.B.'s room. Nurses immediately went to A.B., and a nurse followed Mr. B. to his room.

When the nurses entered A.B.'s room, they found her lying in her bed, as she held a telephone to her ear and appeared to be involved in a conversation. Her diaper was open, as before, but feces had become smeared on her perianal area and the pad beneath her. In addition, her bed was open at one end, and footprints of feces appeared on the interior walls at the foot of her bed. When asked if anyone had touched her, A.B. indicated that a sexual assault had taken place by gesturing with her hands. A.B. also told one of the nurses that a man had come into her room and "had sex" with her. A.B. did not appear upset, was not crying, and responded that she was "okay" when asked. The medical staff at TIRR did not observe any

evidence of trauma to A.B.'s genital area, but noticed redness around her vagina and observed that A.B.'s face was flushed. A.B. was transferred to Hermann Hospital for examination for suspected sexual assault, and police and A.B.'s parents were notified.

The nurse who followed Mr. B. to his room after the assault found him in his bathroom. He was clothed and attempting to clean feces from his feet. The nurse confirmed that no feces or secretions of any kind were apparent on Mr. B.'s genitals.

The physician who examined A.B. at Hermann Hospital at about 1:30 a.m. the following morning noted that A.B. had no recollection of any events of the previous few hours and exhibited no acute distress or pain. Two additional members of the examining team noted that A.B. could not recall the events of the evening, but a police officer indicated that she reported a sexual assault. The physician's pelvic exam of A.B. found no lacerations in her vaginal wall, no vaginal bleeding, and that all was "within normal limits." Rape-kit swabs taken from A.B.'s perianal area at the same time confirmed the presence of semen, but no DNA testing was performed.

At the time of the assault, A.B. was physically and neurologically impaired. Although she could move her limbs slightly, she had poor balance, with no strength in her limbs, and therefore needed assistance to stand, sit, and eat. Diagnostic testing of A.B. by TIRR near the date of the incident described her as "oriented times two," or as to "person and place." This meant that she knew who she was and where she was.[2] She could neither consent to sexual activity nor physically resist sexual advances.

A.B. remained at TIRR for about 10 weeks after the assault, or until mid-November 1997, when she was transferred to a rehabilitation facility known as "the Ranch." While she was at TIRR and the Ranch, A.B.'s family and her boyfriend, R.P., observed A.B. having emotional reactions caused by the assault at TIRR. According to a stipulation entered into by the parties during trial, however, nothing in the records of the Ranch revealed any change in A.B.'s behavior or actions that could be attributed or related to the sexual assault.

After her release from the Ranch in May 1998, A.B. lived primarily with her parents until April 2000. During that time, A.B. received outpatient treatment from a psychiatrist, Kathy Scott–Gurnell, M.D. A.B.'s last visit to Dr. Scott–Gurnell was on April 11, 2000. She saw no psychiatrists or psychologists after that date. In August 2001, A.B. moved into her own apartment.

The case was tried in March and April 2002, almost five years after the August 1997 assault. TIRR vigorously disputed liability at trial, suggesting that the semen recovered was not that of Mr. B. and that A.B. had an ongoing sexual relationship with her boyfriend at the time. The parties also disputed, through opposing expert testimony, whether A.B. experienced past or future mental anguish.

### N.N.'s Appeal: Legal Sufficiency of Future Mental Anguish Damages

In her sole challenge on appeal, N.N. contends that the trial court erred by rendering a JNOV on the jury's future mental anguish award. TIRR, however, contends

---

**2.** The physician who examined A.B. at Hermann Hospital after the assault described her

as oriented times three, meaning that she also knew the date.

that the evidence is legally insufficient to show that A.B. would, in all reasonable probability, experience mental anguish in the future, i.e., after the April 2002 trial, and that there is no evidence to justify the award for $625,000.

## I. Standard of Review

A trial court may disregard a jury's verdict and render a JNOV if no evidence supports one or more of the jury's findings, or if a directed verdict would have been proper. *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex.2003); *Brown v. Bank of Galveston, N.A.*, 963 S.W.2d 511, 513 (Tex.1998); *Williams v. Briscoe*, 137 S.W.3d 120, 124 (Tex.App.-Houston [1st Dist.] 2004, no pet.). To determine whether the trial court erred in rendering a JNOV, we consider only the evidence and reasonable inferences from that evidence that tend to support the jury's answers. *Tiller*, 121 S.W.3d at 713; *Williams*, 137 S.W.3d at 124. In short, we view the evidence in the light most favorable to the verdict under the well-settled standards that govern "no evidence," i.e., legal-sufficiency review. *See Wal–Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex.2003); *Williams*, 137 S.W.3d at 124.

"The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005). "[L]egal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id.* If the evidence "would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so." *Id.* at 822. "A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the

evidence falls within this zone of reasonable disagreement." *Id.* Although the reviewing court must "consider evidence in the light most favorable to the judgment, and indulge every reasonable inference that would support it[,] ... if the evidence allows of only one inference, neither jurors nor the reviewing court may disregard it." *Id.*

## II. Mental Anguish Damages

The case before us involves claims for personal injury, for which the law authorizes recovery of damages for mental anguish. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 763 (Tex.2003) (listing mental anguish among compensable, non-economic damages recoverable in personal injury cases). In *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex.1995), the Texas Supreme Court set out the requirements for proof of recovery for mental anguish damages. The instructions to the jury in this case tracked the following "typical" definition of mental anguish described by the court in *Parkway:*

> The term "mental anguish" implies a relatively high degree of mental pain and distress. It is more than mere disappointment, anger, resentment or embarrassment, although it may include all of these. It includes a mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair and/or public humiliation.

*See id.* at 444 (quoting *Trevino v. Sw. Bell Tel. Co.*, 582 S.W.2d 582, 584 (Tex.Civ. App.-Corpus Christi 1979, no writ)).

N.N. first contends that the jury charge was "flawed" because the trial court's charge to the jury included the definition of "mental anguish," derived from the *Parkway* case. *See Parkway*, 901 S.W.2d at 444. N.N.'s objection to the charge, which the trial court overruled,

was that the *Parkway* definition does not apply to this personal injury case and applies only to cases involving damage to property. However, we see no reason to define the term "mental anguish" differently in different types of cases. Although the definition is "somewhat unwieldy" and "admittedly nebulous," *id.,* it does instruct juries to distinguish between emotions that constitute "lesser" reactions and degrees of emotions, for example, disappointment, embarrassment, resentment, and anger, from more extreme degrees of emotions, for example, severe disappointment, wounded pride, indignation, grief, shame, despair, and public humiliation. *See id.*

In claims for property damage, compensable mental anguish damages can be proved by " 'direct evidence of the nature, duration, or severity of [a plaintiff's] anguish, thus establishing a substantial disruption in the plaintiff's daily routine.' " *Saenz v. Fidelity & Guar. Ins. Underwriters,* 925 S.W.2d 607, 614 (Tex.1996) (citing *Parkway,* 901 S.W.2d at 444). As a general rule, evidence to establish "adequate details to assess mental anguish claims" can be demonstrated by "the claimants' own testimony, that of third parties, or that of experts." *See Parkway,* 901 S.W.2d at 444. This type of evidence, however, is not required in claims for personal injuries and "some types of disturbing or shocking injuries." *Fifth Club, Inc. v. Ramirez,* 196 S.W.3d 788, 797 (Tex. 2006).

In *Fifth Club,* the supreme court held that appellate review for legal sufficiency of evidence of future mental anguish damages is different for claims that involve personal injuries, as compared to claims for property damage. *Id.* at 798 (stating that "what distinguishes [the *Saenz* and *Parkway* decisions] is that neither of them, *Saenz* (wrongful inducement to settle a worker's compensation claim) or *Parkway*

(flooded home), involved a claim for personal injuries"). The court noted that historically, "some types of disturbing or shocking injuries have been found sufficient to support an inference that the injury was accompanied by mental anguish." *Id.* at 797. In *Fifth Club,* Ramirez, the respondent, had been severely beaten by an independent contractor who provided security at a nightclub owned by Fifth Club. *Id.* at 790. The beating resulted in severe injuries to Ramirez, including a fractured skull. *Id.* The court upheld the jury's future mental anguish award as legally sufficient by stating, "We believe the severe beating received by Ramirez provided an adequate basis for the jury to reasonably conclude that he would continue to suffer substantial disruptions in his daily routine of the kind described in his and his wife's testimony that he had already suffered in the past." *Id.* at 798. The court noted that the evidence in the record showed "the nature of Ramirez's mental anguish, its lasting duration, and the severity of his injuries" that he suffered from "an intentional beating . . . including significant injuries to his head and body, his loss of consciousness, and his visits to the hospital." *Id.* at 797–98. The evidence in the record also showed that Ramirez was depressed, humiliated, noncommunicative, unable to sleep, and angry, and continued to have headaches and nightmares, and that his daily activities and his relationships with his wife and daughter continued to be detrimentally affected almost two years after the incident. *Id.* at 797. The court concluded, "The evidence in this case amounts to far more than worry that medical bills might not get paid, as in *Saenz,* or that someone is disturbed and upset, as in *Parkway.*" *Id.* at 798.

With respect to recovery of future damages, we note that Texas courts follow

the "reasonable probability rule." *MCI Telecomm. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 654 (Tex.1999). To meet the reasonable probability rule, a plaintiff must (1) present evidence that, in reasonable probability, she will suffer damages in the future and (2) prove the probable reasonable amount of the future damages. *Id.* at 654–55.

### III. Circumstantial Evidence or Inferences of Future Mental Anguish

 Although shocking and disturbing incidents such as the sexual assault of A.B. have historically been found sufficient to support an inference that the injury was accompanied by mental anguish, the evidence here establishes much more. Viewing the evidence in a light most favorable to the jury's verdict, the underlying facts that can reasonably support an inference of future mental anguish are as follows:

- A.B. was sexually assaulted in a shocking and disturbing manner;
- A.B. was threatened with physical harm if she told anyone about the assault;
- On the night of the assault, A.B. had a flushed face;
- Shortly after the assault, A.B. began to weep and asked for her "mommy";
- During the three-year period of time that followed the assault, A.B. cried, broke down, could not speak, felt heartbroken, feared going to sleep, had trouble sleeping, took medication to sleep, apologized for not stopping the assault, felt "dirty," and felt embarrassed about telling her boyfriend about the assault because he would think she was dirty;
- After the sexual assault, A.B. expressed that she felt uncomfortable in the hospital, felt uncomfortable with some sexual relationships, and "felt dirty";

- Dr. Perez explained that rape victims commonly respond that they feel dirty;
- Dr. Perez stated in April 2002 that A.B. "is suffering from anguish in her implicit memory";
- A.B.'s impaired explicit memory makes her "incapable" of treatment through traditional counseling or talking therapy;
- Because of the inability to treat A.B. with traditional counseling or talking therapy, A.B. would be unable to "put the incident in some sort of perspective";
- A.B. cannot express her emotions clearly because that part of her brain that controls expression of emotion has been removed;
- A.B.'s improving memory will cause her to remember the assault more in the future; and
- A.B.'s implicit memories will not lessen as quickly with the passage of time as explicit memories.

The Merriam–Webster's Collegiate Dictionary defines "dirty" as, among other things, (1) "not clean or pure"; (2) "likely to [be] befoul[ed] or defile[d] with dirt"; (3) "containing impurities"; or (4) "morally unclean or corrupt: . . . indecent, vulgar." Merriam-Webster's Collegiate dictionary 354 (11th ed.2003). Feeling dirty, for a sexual assault victim, is a mental sensation of pain that is in essence the equivalent emotion of shame. *See Parkway*, 901 S.W.2d at 444 (including shame as compensable emotion). Despite A.B.'s mental limitations, she was able to express clearly that she felt "dirty," and, given her inability to obtain effective treatment, it is reasonably probable that she will continue to experience that and other emotions in the future. Moreover, Dr. Perez testified that given her previous brain injury, A.B. would be incapable of treatment through

traditional counseling or talking therapy and thus unable to "put the incident in some sort of perspective." From this evidence, the jury could have reasonably inferred that A.B. would, in all reasonable probability, experience future mental anguish.

In support of its contention that N.N. presented no evidence to support the jury's award of future mental anguish damages, TIRR contends that our prior holding in *Rice Food Mkts., Inc. v. Williams* "controls this case." 47 S.W.3d 734 (Tex.App.-Houston [1st Dist.] 2001, pet. denied). In *Rice*, the majority held that the evidence was legally insufficient to support an award for past mental anguish. *Id.* at 739. While at work as a meat manager for Rice, Williams injured his arm causing a complete rupture of the biceps tendon, which was surgically repaired. *Id.* at 736. The jury awarded Williams three separate awards for damages for (1) past medical expenses, (2) pain, and (3) past mental anguish. *Id.* Rice challenged the legal and factual sufficiency of the evidence to support the mental anguish award. *Id.* at 737. The majority noted that 12 of the 17 record references that Williams referred to as evidence of mental anguish concerned the pain that resulted from his injury and excluded that evidence from consideration because the jury made separate awards for pain and mental anguish. *Id.* at 738. The remaining five record references were, as follows: (1) Williams was ashamed to let his wife know that due to his claustrophobia he had difficulty with the MRI, but everything was fine when she came to the hospital, (2) he was a little apprehensive about the surgery because he had never had surgery or been under an anesthetic before and felt anguish over how the surgery would affect him, (3) he worried, agonized, and wondered what would happen next concerning his injured arm, his loss of income, and his ability to pay his bills, (4) he felt humbled by his wife having to do things for him that he usually did for himself, and (5) it was uneasy for him to accept that he was dependent on his wife to take care of his family. *Id.* After citing to *Saenz* and *Parkway*, the majority noted that Williams's "apprehension regarding his claustrophobia, his apprehension regarding surgery, his worry over his finances, and his concern about the assistance given him by his wife [did] not reveal a high degree of mental pain and distress that [was] more than mere worry, anxiety, vexation, embarrassment, or anger." *Id.* Here, in contrast to *Rice*, the evidence reveals that A.B. suffered a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. *See id.* The severity of the sexual assault inflicted upon A.B., the evidence of past mental anguish that she suffered, and the evidence that A.B. was incapable of treatment provide an adequate basis for the jury to reasonably conclude that she would continue to suffer mental anguish in the future. *Fifth Club*, 196 S.w.3d at 797–98.

██ The jury could also have reasonably determined that an amount of $625,000 was reasonable compensation for the mental anguish that A.B. would, in all reasonable probability, suffer as a result of the assault. Viewed in a light most favorable to the jury's verdict, it is reasonable to infer from the evidence that A.B., who was approximately 23 years old at the time of trial, would, in all reasonable probability, experience shame in the future by feeling dirty—that is, not clean or pure, containing impurities, or morally unclean or corrupt, indecent, vulgar—and would also continue to experience other emotional reactions that she experienced in the three

years following the assault, such as crying and feeling heartbroken.

We are not required and do not attempt to evaluate the amount awarded by the jury with "mathematical precision." *See Bentley v. Bunton,* 94 S.W.3d 561, 605 (Tex.2002). We also note that the jury award for future mental anguish is only approximately twice that awarded by the jury for past mental anguish. *See id.* at 607 (holding award for mental anguish 40 times amount awarded for damaging reputation "far beyond any figure the evidence can support"). Simply put, we cannot call the amount of the jury award unsound or excessive. *See id.* The jury could have determined that in all reasonable probability, A.B. would experience future mental anguish compensable by an amount of $625,000.

In summary, we conclude that more than a scintilla of evidence shows that A.B. would, in all reasonable probability, experience future mental anguish and, therefore, that the evidence is legally sufficient to establish future mental anguish. We further conclude that some evidence in the record shows that in all reasonable probability, A.B. would suffer future mental anguish in an amount reasonably compensable by $625,000. Because the evidence is legally sufficient to establish compensable future mental anguish and, therefore, to warrant damages for that mental anguish, we hold that the trial court erred by rendering JNOV in favor of TIRR.

### TIRR's Appeal

Having sustained N.N.'s sole issue on appeal, we must address TIRR's cross-points that challenge the factual sufficiency of the evidence to show that A.B. would, in all reasonable probability, experience future mental anguish in an amount compensable by $625,000 and that TIRR was negligent. These cross-points, however, are contingent upon our authority to review the factual sufficiency complaints.

### I. Authority to Address Factual Sufficiency Challenge

TIRR initially argues that we should remand the cause to the trial court so that TIRR may obtain trial-court review of, and a ruling on, TIRR's factual-sufficiency challenges. It further contends that we have no authority to address the factual-sufficiency challenges asserted in its cross-points because TIRR had no opportunity to obtain review of its factual sufficiency complaints in the trial court due to that court's having sustained TIRR's motion for JNOV.

Rule 324(c) of the Rules of Civil Procedure and rule 38.2(b)(1) of the Rules of Appellate Procedure together authorize this Court to review factual-sufficiency complaints in the interests of judicial economy and efficiency when a JNOV is reversed on appeal. *See* TEX.R. CIV. P. 324(c); TEX.R.APP. P. 38.2(b)(1); *Jackson,* 411 S.W.2d at 718 (construing rule 324(c)).

When, as here, the trial court renders a JNOV, and the losing party appeals, the prevailing party may also appeal and present points or issues on any ground, including factual-sufficiency challenges, that would either (1) vitiate the verdict or (2) preclude affirming the judgment and reinstating the jury's verdict. *Jackson,* 411 S.W.2d at 718; *see also Billings v. Atkinson,* 489 S.W.2d 858, 861 (Tex.1973); *Swink v. Alesi,* 999 S.W.2d 107, 111–12 (Tex.App.-Houston [14th Dist.] 1999, no pet.); *Kenneco Energy v. Johnson & Higgins,* 921 S.W.2d 254, 263–64 (Tex.App.-Houston [1st Dist.] 1995), *rev'd on other grounds,* 962 S.W.2d 507 (Tex.1998); *Winograd v. Clear Lake City Water Auth.,* 811 S.W.2d 147, 159 (Tex.App.-Houston [1st Dist.] 1991, writ denied).

■ The purpose of rules 324(c) and 38.2(b)(1) is to enable final disposition of a case by an appellate court, based on the record of a trial, when the appellate court reverses an erroneously rendered JNOV and, therefore, to order a remand only when a complaint on appeal requires that additional evidence be taken, for example, a claim of jury misconduct. *See Jackson*, 411 S.W.2d at 718; *Alesi*, 999 S.W.2d at 112.

Rule 38.2(b)(1) similarly provides that when a trial court renders a JNOV, "the appellee must bring forward by cross-point any issue or point that would have vitiated the verdict or that would have prevented an affirmance of the judgment if the trial court had rendered judgment on the verdict." Tex.R.App. P. 38.2(b)(1). The rule encompasses points asserting that "the verdict or one or more jury findings have insufficient evidentiary support or are against the overwhelming preponderance of the evidence as a matter of fact." Tex. R.App. P. 38.2(b)(1)(A). Similarly, rule 324(c) states that when a JNOV is rendered, the appellee "may bring forward by cross-point in his brief filed in the Court of Appeals any ground which would have vitiated the verdict or would have prevented an affirmance of the judgment had one been rendered in the trial court in harmony with the verdict, including . . . the ground that one or more of the jury's findings have insufficient support in the evidence or are against the overwhelming preponderance of the evidence as a matter of fact." Tex.R. Civ. P. 324(c).

TIRR acknowledges that these rules serve the interests of judicial efficiency, but argues that the rules violate the Texas Constitution. *See* Tex. Const. art. I, §§ 13, 19; art. V, §§ 6, 8. In support of its constitutional challenge, TIRR argues that rules 324(c) and 38.2(b)(1) deprived TIRR of an opportunity to present its factual

sufficiency complaints to the trial court concerning the jury's finding TIRR negligent, in response to question number one, and concerning the jury's awarding $625,000 in damages for A.B.'s future mental anguish, in response to question number two.

TIRR reasons that rules 324(c) and 38.2(b)(1) violate article V of the Texas Constitution because appellate courts have no *original* jurisdiction to address factual sufficiency of the evidence, which, TIRR contends, must first be addressed by the trial court before this Court may exercise its appellate jurisdiction to review a factual sufficiency challenge. *See* Tex. Const. art. V, § 6 ("Said court of appeals shall have appellate jurisdiction co-extensive with the limits of the respective districts, which shall extend to all cases of which the District Courts or County Courts have original or appellate jurisdiction."); *Id.* § 8 ("District Court jurisdiction consists of . . . original jurisdiction of all actions, proceedings, and remedies . . . ."). TIRR argues that an original ruling by this Court on factual-sufficiency grounds deprives TIRR of its right to present its factual sufficiency points to the trial court and therefore denies TIRR due course of law, as guaranteed by the constitution. *See* Tex. Const. art. I, §§ 13, 19 ("All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law"; "No citizen . . . shall be deprived of . . . property . . . except by the due course of the law.").

TIRR relies solely on these constitutional provisions and cites no additional authority in support of its challenge to the authority granted us by rules 324(c) and 38.2(b)(1) to address factual-sufficiency issues brought by an appellee through a cross-point on appeal. *See Jackson*, 411 S.W.2d at 718.

■ Section 22.004(a) of the Government Code vests the supreme court with full rulemaking authority for practice and procedure in civil cases, subject to the limitation that rules enacted by the court may not abridge, enlarge, or modify the substantive rights of a litigant. *See* TEX. GOV'T CODE ANN. § 22.004(a) (Vernon 2004). In enacting the former version of section 22.004(a) in 1999 and delegating its former statutory authority to enact procedural rules to the supreme court, the Legislature " 'confer[red] upon and relinquish[ed] . . . full rulemaking power' " to that court. *In re City of Georgetown*, 53 S.W.3d 328, 332 & n. 2 (Tex.2001) (orig.proceeding) (quoting Act of May 12, 1939, 46th Leg., R.S., ch. 25, § 1, 1939 Tex. Gen. Laws 201 (former TEX.REV.CIV. STAT. ANN. art. 1731a)). By virtue of the 1939 delegation, the rules of civil and appellate procedure have the force and effect of statutory provisions. *See id.; Mo. Pac. R.R. Co. v. Cross*, 501 S.W.2d 868, 872 (Tex.1973); *Freeman v. Freeman*, 160 Tex. 148, 327 S.W.2d 428, 433 (1959); *see also Sherrill v. Estate of Plumley*, 514 S.W.2d 286, 297 (Tex.Civ. App.-Houston [1st Dist.] 1974, writ ref'd n.r.e.) (stating that rules of civil procedure have weight and effect of supreme court decisions and are binding on court of appeals). Accordingly, we must observe and follow the rules and we have no authority to deviate from them. *See Beach v. Runnels*, 379 S.W.2d 684, 686 (Tex.Civ.App.-Dallas 1964, writ ref'd); *Centennial Ins. Co. v. Commercial Union Ins. Cos.*, 803 S.W.2d 479, 482 (Tex.App.-Houston [14th Dist.] 1991, no writ).

■ Parties may challenge constitutionality by contending that the provision is facially invalid or is invalid as applied to that party. *See Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 518 n. 16 (Tex.1995). Settled statutory law and common law precedent, however, presume that statutes are constitutional and impose a heavy burden on the challenger to demonstrate unconstitutionality. *See* TEX. GOV'T CODE ANN. § 311.021(1) (Vernon 2005); *In re Commitment of Fisher*, 164 S.W.3d 637, 645 (Tex.2005); *Tex. Mun. League Intergovernmental Risk Pool v. Tex. Workers' Comp. Comm'n*, 74 S.W.3d 377, 381 (Tex.2002); *Brady v. Fourteenth Court of Appeals*, 795 S.W.2d 712, 715 (Tex.1990); *Tex. Nat'l Guard Armory Bd. v. McCraw*, 132 Tex. 613, 624–25, 126 S.W.2d 627, 634 (Tex.1939). The rules of procedure are construed as binding in the same manner as statutes. *See In re City of Georgetown*, 53 S.W.3d at 332. Accordingly, TIRR has the burden here to demonstrate that rules 324(c) and 38.2(b)(1)(A) are unconstitutional. *See id.; Brady*, 795 S.W.2d at 715; *Tex. Nat'l Guard Armory Bd.*, 132 Tex. at 624–25, 126 S.W.2d at 634.

Because TIRR has not specified in its brief whether it contends that rules 324(c) and 38.2(b)(1) are unconstitutional on their face or as applied, we address both challenges.

## A. "As Applied" Constitutional Challenge

■ A party who challenges a rule or statute "as applied" contends that the rule or statute is generally constitutional, but argues that it is unconstitutional when applied to that party or that party's set of facts. *See Tex. Mun. League Intergovernmental Risk Pool*, 74 S.W.3d at 381.

### 1. Challenge to Negligence Finding

■ The record before us negates, in part, TIRR's as-applied challenge because the record establishes that TIRR actually presented to the trial court its factual-sufficiency challenges to the jury's finding TIRR negligent and obtained a ruling on the challenge. TIRR filed both an original and a first amended motion for new trial.

In its amended motion, TIRR argued that the evidence was factually insufficient to support the jury's affirmative answer to question number one, which asked, "Did the negligence, if any, of TIRR proximately cause the occurrence in question?" In the same motion, TIRR argued that N.N. did not establish the standard of care for hospital nursing services and the standard of care concerning a rehabilitation hospital's required placement of a patient under one-on-one observation. It also contended that the overwhelming weight of the evidence showed that the appropriate standard of care would not require a one-on-one observation, and that sexual aggression was not a foreseeable consequence of a failure to provide more supervision.[3]

The record further demonstrates that TIRR's motion for new trial was not overruled as a matter of law, i.e., without direct action by the trial court. Rather, the trial court's signed order denied TIRR's first amended motion for new trial, suggested a remittitur to reduce the jury's award of $300,000 for past mental anguish award to $150,000, and stated the trial court's intent to grant a new trial in the event that N.N. did not file a remittitur.

The record affirmatively negates TIRR's "as applied" constitutional challenge to rules 324(c) and 38.2(b)(1) with respect to the jury's negligence finding in response to question number one because the record establishes not only that TIRR actually presented its factual-sufficiency challenges to the jury's negligence findings to the trial court, but also that the trial court ruled specifically on those complaints by rejecting them. We therefore overrule TIRR's "as applied" challenge to the constitutionality of rules 324(c) and 38.2(b)(1),

as these affect the jury's negligence finding.

### 2. Challenge to $625,000 Awarded for Future Mental Anguish

TIRR also argues that it was deprived of its opportunity to obtain trial-court review of its factual-sufficiency challenge to the jury's award of $625,000 as compensation for A.B.'s mental anguish in the future. In contrast to its asserted challenge to the negligence findings, TIRR did not present to the trial court its challenge to the factual sufficiency of the evidence to support the jury's award for future mental anguish. That TIRR did not assert the challenge, however, does not compel the conclusion that TIRR could not have asserted the challenge. TIRR has not demonstrated any basis on which to claim that it was deprived of an opportunity to obtain trial-court review of the jury's awarding $625,000 as damages for A.B.'s future damages. In fact, the trial court granted TIRR's motion for JNOV on the grounds that the evidence was legally insufficient to support the jury's award.

We therefore overrule TIRR's "as applied" challenge to the constitutionality of rules 324(c) and 38.2(b)(1) as they affect the jury's award of $625,000 for future mental anguish damages.

### B. "Facial" Invalidity Challenge

 To prevail on a facial invalidity challenge, the complaining party "must establish that the statute, by its terms, always operates unconstitutionally." *City of Corpus Christi v. Public Utility Comm'n*, 51 S.W.3d 231, 240–41 (Tex.2001) (citing *Barshop v. Medina County Underground Water Conservation Dist.*, 925 S.W.2d 618, 627 (Tex.1996)). Facial invalidity cannot be premised on "hypothetical facts that

---

3. Also in the amended motion for new trial, TIRR argued that the evidence was factually insufficient to demonstrate that A.B. sustained compensable mental anguish in the past, a complaint on which TIRR had also requested a remittitur.

have not yet arisen." *Tex. Boll Weevil Eradication Found., Inc. v. Lewellen,* 952 S.W.2d 454, 463 (Tex.1997) (citing *Garcia,* 893 S.W.2d at 518).

Here, TIRR has not demonstrated that rules 324(c) and 38.2(b)(1) operate unconstitutionally in every instance. *See City of Corpus Christi,* 51 S.W.3d at 240–41. Specifically, TIRR has not demonstrated that rules 324(c) and 38.2(b)(1) consistently deprive litigants of the opportunity to present their factual-sufficiency complaints to the trial court when that court renders a JNOV. Indeed, as demonstrated by our "as applied" analysis of TIRR's challenge, there is no loss of the right to assert a factual-sufficiency challenge to the trial court in cases like this one, in which a litigant presents factual-sufficiency complaints to the trial court in a motion for new trial and obtains a ruling on those complaints.

We hold that TIRR has thus failed to meet its heavy burden to overcome the presumption of constitutionality that necessarily accompanies rules 324(c) and 38.2(b)(1) as enactments by our supreme court. *See, e.g., In re Commitment of Fisher,* 164 S.W.3d at 645; *In re City of Georgetown,* 53 S.W.3d at 332. We overrule TIRR's challenge to the constitutionality of rules 324(c) and 38.2(b)(1), both as applied to TIRR and on their face. Accordingly, we address TIRR's cross-points.

## II. Factual Sufficiency of Evidence of Future "Mental Anguish" Damages

In its first cross-point, TIRR contends that the evidence is factually insufficient to show that A.B. would, in all reasonable probability, experience mental anguish in the future, or in an amount compensable by $625,000, and asks that we suggest a remittitur for a "nominal amount" for future mental anguish.

## A. Factual Sufficiency Requisites for Mental Anguish Damages

■ We are authorized to determine whether damage awards are supported by insufficient evidence—that is, whether they are excessive or unreasonable. *Bentley,* 94 S.W.3d at 606. The factual-sufficiency standard controls contentions that an award of damages for mental anguish damages is excessive. *See Healthcare Centers of Tex., Inc. v. Rigby,* 97 S.W.3d 610, 623 (Tex.App.-Houston [14th Dist.] 2002, pet. denied) (citing *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406 (Tex.1998)). This is the same test that controls any factual-sufficiency question. *Id.* (citing *Pope v. Moore,* 711 S.W.2d 622, 624 (Tex.1986)). In addressing a challenge to the factual sufficiency of the evidence to support a jury's award of damages for future mental anguish damages, we must, therefore, consider and weigh all the evidence, both that which supports and that which conflicts with the award. *Durban v. Guajardo,* 79 S.W.3d 198, 208 (Tex.App.-Dallas 2002, no pet.). We may set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.* It is the jury's role, not ours, to assess the credibility of the evidence, to accord it weight, and to resolve inconsistencies within or conflicts among the witnesses' testimony. *Id.*

■ As noted above, juries must find an amount that "would fairly and reasonably compensate" for the mental anguish that in all reasonable probability in the future would cause a "substantial disruption in daily routine" or a "high degree of mental pain and distress." *See Saenz,* 925 S.W.2d at 614 (citing *Parkway,* 901 S.W.2d at 444). Although "there must be evidence that the amount found is fair and reasonable compensation," *see Saenz,* 925 S.W.2d at 614, a mental anguish award "cannot be determined with mathematical

precision" and "can be determined only by the exercise of sound judgment." *Bentley*, 94 S.W.3d at 605.

### B. TIRR's Contentions

TIRR asserts several challenges to the jury's determination that $625,000 would reasonably compensate A.B. for her future mental anguish. TIRR points to evidence that shows that A.B. was not "physically injured" on the night of the assault, had no memory of the assault at any time, showed no emotional reactions relating to the assault, and did not need or receive mental health therapy as a result of the assault. TIRR further asserts that A.B. has a relatively normal existence, lives by herself, and has been engaged to be married.

According to TIRR's expert, Dr. Boake, who was A.B.'s treating neuropsychologist when she was at TIRR in 1997, A.B. may be remembering what people have told her about the assault rather than the assault itself. Dr. Boake is a psychologist who specializes in neuropsychology, specifically by working with brain-injured patients who are in rehabilitation. Dr. Boake treated A.B. at the Ranch after her injury, tested her cognitive abilities, and conducted research in which A.B. was one of several subjects. As part of his evaluation of A.B., he also reviewed TIRR's hospital records regarding A.B. and records of neuropsychology testing and research testing that was performed on her. Dr. Boake disputes Dr. Perez's opinions by stating that A.B.'s improving memory would not cause her to remember more about the assault because the assault occurred when she had amnesia. Dr. Boake also denies that A.B. has an implicit memory of the assault and that A.B. sought mental health treatment for the assault from Dr. Scott–Gurnell.

The jury, as the sole determiner of the credibility of the witnesses, was within its discretion to find the testimony from Dr. Perez more credible than Dr. Boake's testimony. *See Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex.1988); *M.D. Anderson Hosp. and Tumor Inst. v. Felter*, 837 S.W.2d 245, 247 (Tex.App.-Houston [1st Dist.] 1992, no writ). Although Dr. Boake states and the medical records show that A.B. did not exhibit emotions related to the assault, that evidence is inconsistent with the descriptions of A.B.'s emotions provided by A.B.'s family and boyfriend. The jury could have reasonably determined that A.B. could exhibit emotions related to the assault more freely when she was around people whom she trusted most, her family and her boyfriend. The jury could have reasonably found Dr. Perez's testimony credible that A.B. did not have amnesia at the time of the assault, because witnesses testified that A.B. described the assault to them after it happened and that she recalled the assault.

Because the evidence was conflicting and subject to credibility and weight determinations by the jury, the jury could have reasonably reconciled the evidence in favor of A.B. The jury could have reasonably determined that A.B. would, in the future and in all reasonable probability, feel dirty—that is, not clean or pure, containing impurities, or morally unclean or corrupt, indecent, vulgar—and therefore suffer a high degree of mental pain and distress. *See Hicks v. Ricardo*, 834 S.W.2d 587, 592 (Tex.App.-Houston [1st Dist.] 1992, no writ) (noting that evidence of future mental anguish is present "when the same circumstances that produced at least some of the previous mental anguish are likely to recur"); *Durban*, 79 S.W.3d at 208 (holding that evidence that anguish suffered by plaintiff at time of trial "would continue for some period of time" and that plaintiff would relive incident "from time to time for the rest of her life" was factual-

ly sufficient to uphold future mental anguish award).

The jury's award for A.B.'s past mental anguish was $300,000. This amount, for a period of time of approximately five years, is almost half the amount awarded for future mental anguish. *See Durban,* 79 S.W.3d at 208 (holding that award for future mental anguish of two and one-half times amount of award for past mental anguish suffered by plaintiff during ten-and-one-half month period was fair, reasonable, and within jury's discretion). A.B., who was approximately 23 years old at the time of trial, is incapable of treatment through traditional counseling or talking therapy, and the reasonable inference from the evidence is that she will in all reasonable probability in the future, feel dirty—that is, not clean or pure, containing impurities, or morally unclean or corrupt, indecent, vulgar. The jury could have, therefore, reasonably determined that an amount of $625,000 was fair and reasonable compensation for the mental anguish that A.B. would experience in the future as a result of the assault. *See id.*

After considering and weighing all of the evidence, both supporting and conflicting with the jury's award of $625,000 for future mental anguish, we conclude that the evidence that A.B. would reasonably experience future mental anguish in the amount of $625,000 is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See id.* We therefore hold that the evidence is factually sufficient to support the jury's award of future mental anguish damages in the amount of $625,000.

We overrule TIRR's first cross-point.

### III. Negligence Finding

In its second cross-point, TIRR contends that the evidence of TIRR's negligence as a proximate cause of the occur-rence is so insufficient or so against the great weight and preponderance of the evidence as to make the jury's answer of "yes" to question number one clearly wrong and manifestly unjust. TIRR contends that (1) the great weight and preponderance of the evidence shows that TIRR met the accepted standard of safety, as required by former article 4590i, and was thus not negligent in treating and observing Mr. B., who assaulted A.B., and (2) the evidence supporting the jury's finding in question number one of the jury charge, that the negligence of TIRR proximately caused the occurrence in question, was factually insufficient.

In assessing the factual sufficiency of the evidence to support a jury's finding of negligence, we must weigh all the evidence, both supporting and conflicting with the finding, and may set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Comm'n of Contracts of the Gen. Exec. Comm. of Petroleum Workers Union of the Republic of Mex. v. Arriba, Ltd.,* 882 S.W.2d 576, 582 (Tex.App.-Houston [1st Dist.] 1994, no writ); *Felter,* 837 S.W.2d at 247. In conducting our review, however, we must be mindful of the factfinder's role as the sole determiner of credibility of the witnesses and the weight to give their testimony, and we may not substitute our opinion for the factfinder's solely because we might have resolved the facts differently. *Herbert,* 754 S.W.2d at 144; *Felter,* 837 S.W.2d at 247.

In a medical malpractice case, to show negligence, the plaintiff must prove: (1) a duty by the professional to act according to a standard, (2) a breach of the applicable standard of care, (3) an injury, and (4) damages proximately caused by

the breach. *Ocomen v. Rubio,* 24 S.W.3d 461, 466 (Tex.App.-Houston [1st Dist.] 2000, no pet.). TIRR challenges the factual sufficiency of two elements of negligence—(1) breach of TIRR's duty to comply with the proper medical standards of care and safety, and (2) proximate cause.

 TIRR contends that "[t]he great weight of the evidence is that TIRR staff met the standard of care and was not negligent in treating and observing Mr. B." In other words, TIRR contends that the great weight of the evidence shows that TIRR did not breach its duty to provide A.B. with the proper medical standards of care and safety required by former article 4590i.

 This "health care standard applies the ordinary care of trained and experienced medical professionals to the treatment of patients entrusted to them." [4] *Diversicare Gen. Partner, Inc. v. Rubio,* 185 S.W.3d 842, 850 (Tex.2005). Former article 4590i governs health care liability claims, defined as "cause[s] of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care or health care or safety which proximately results in injury to or death of the patient." *See* former Tex. Civ. Prac. & Rem.Code Ann. art. 4590i, § 1.03(a)(4) (current version at Tex. Civ. Prac. & Rem.Code Ann. § 74.001(a)(13) (Vernon 2005)). A cause of action against a health care provider is thus a healthcare liability claim when "based on a claimed

departure from an accepted standard of medical care, health care, or safety of the patient." *Diversicare,* 185 S.W.3d at 848. Supervision by a hospital of both a patient and a patient who assaults another are inseparable from the accepted standards of safety required under former article 4590i. *See id.* at 850. Because "[i]t is not within the common knowledge of the general public to determine the ability of patients in weakened conditions to protect themselves, nor [to determine] whether a potential target of an attack in a healthcare facility should be better protected and by what means," expert testimony is necessary to prove whether a healthcare provider has complied with the accepted standards of care and safety. *Id.* at 851.

Six experts testified at trial—two on behalf of N.N. and four on behalf of TIRR. TIRR contends that N.N.'s "evidence supporting her claim of negligence is weak and insufficient" because one of her expert witnesses, Nurse Mai Chen, "was not a strong witness," and the other, Dr. Perez, "did not materially strengthen [N.N.'s] claim that TIRR staff should have realized that Mr. B. posed a threat of sexual aggression to other patients." TIRR further contends that "the great weight of evidence is that TIRR staff met the standard of care and was not negligent in treating and observing Mr. B.," as established by TIRR's experts.

Chen, N.N.'s nurse expert, testified that TIRR did not meet the required standard of care and safety in its supervision of Mr.

---

4. "Negligence," as submitted to the jury in the court's charge, was defined as "failing to use ordinary care, that is, failing to do that which a *hospital* of ordinary prudence would have done under the same or similar circumstances or doing that which a hospital of ordinary prudence would not have done under the same or similar circumstances." (Emphasis in original). The court's charge was also submitted to the jury with the following instruction regarding ordinary care: "'Ordinary care,' when used with respect to the conduct of *TIRR* means that degree of care that a *hospital* of ordinary prudence would use under the same or similar circumstances," thus complying with 4590i's requirement that the ordinary care be of trained and experienced medical professionals. (Emphasis in original).

B. and that TIRR should have placed Mr. B. on one-on-one observation, which would have prevented Mr. B. from entering A.B.'s room unsupervised and assaulting A.B. Chen was N.N.'s only expert witness to testify regarding TIRR's required standard of care.[5] Chen stated that she was familiar with nursing standards of care, specifically with regard to brain-injured patients, and the record shows that she had approximately 20 years of experience with brain-injured patients.

Chen based her opinion on the following nursing standards of care along with the following facts. A registered nurse must "establish a minimal acceptable level of professional nursing practice" by, among other things, "[i]mplementing measures to promote a safe environment for clients and others." Mr. B., as documented by nurse Helen Aragon, had "walk[ed] naked in his room and wanted to have someone get in bed with him." A TIRR employee also saw Mr. B. walking nude into the hall outside his room near the nurse's station on several occasions, and at other times, Mr. B. was walking around outside A.B.'s room. Mr. B. had also entered A.B's room before the assault occurred, while A.B.'s stepfather was in the room. A.B.'s stepfather reported this incident to TIRR nurses, but TIRR did not implement any measures to prevent Mr. B. from reentering A.B.'s room.

Because Mr. B. (1) took off his clothes, (2) propositioned a nurse to get into bed with him, and (3) entered A.B.'s room unsupervised and without permission, Chen stated that Mr. B. should have been placed on 24–hour one-on-one observation for TIRR to meet the required standards of safety and care. Chen's opinion was supported by the deposition testimony of Helen Aragon that "if the nurse . . . in charge of Mr. [B.] . . . thinks that he's probably going to go into somebody else's room, take his clothes off and try to have sex with [her]," this would be a "big threat" to other patients and thus would require one-on-one observation of Mr. B. Further, Dr. Cindy Ivanhoe, one of TIRR's experts, stated that if a nurse informs a doctor that a patient might go into another patient's room to seek sexual relations, the standard of care would require that the patient be observed "more closely" than ordinarily. Dr. Ivanhoe testified that TIRR did nothing to watch Mr. B. more closely, despite his known requests for sex and observations of him walking around naked, although this information was reported in Mr. B.'s medical chart.

Referring to its four testifying experts, TIRR contends that the great weight of evidence preponderates in favor of a finding that TIRR met the standards of safety and care. Dr. Ivanhoe testified that no aggression by Mr. B. had been reported before the assault, that she did not consider Mr. B. a risk for sexual aggression, and that it was very rare for brain-injured patients to be sexually aggressive. She stated that Mr. B.'s walking naked in his room and asking someone to get into bed with him was "[j]ust behaviorally inappropriate, but not necessarily sexually aggressive," and would not require increasing the level of observation of Mr. B. Dr. Ivanhoe's assessment was based on her observation that Mr. B. "was maintaining himself within his own room." She did not discuss whether Mr. B. left his room while naked and the consequences of that behavior. Nurse Nichols testified that "almost

---

5. Dr. Perez, who also testified as an expert witness for N.N., focused on N.N.'s ability to form memories. TIRR correctly contends that Dr. Perez's testimony did not materially strengthen N.N.'s claim that TIRR did not meet the required standards of care and safety.

all" of the patients at TIRR displayed the types of behaviors that Mr. B. displayed; therefore, if their behavior required one-on-one observation, TIRR would have to initiate this observation for almost all of its patients. Nurse Ryan testified that behavior such as Mr. B.'s was "typical" and not a threat to other patients. Finally, nurse Aragon testified that it was common for a brain-injured, male patient to ask a nurse to get into bed with him, although this would be inappropriate behavior.

The jurors, however, were aware that each of the expert witnesses on whom TIRR relied either worked for or were affiliated with TIRR. The jury was entitled to consider that factor for potential bias and to disregard all or any portion of the witnesses' testimony in reaching its findings in response to the general negligence question. *See Herbert*, 754 S.W.2d at 144; *Felter*, 837 S.W.2d at 247.

We conclude that the jury was entitled to believe Chen's testimony over TIRR's expert testimony. As set forth above, Chen's testimony set forth departures by TIRR from the pertinent standards of medical care and safety. Chen described these standards as the accepted standards required of trained and experienced nurses and asserted that departure from these standards proximately resulted in injury to A.B. The expert testimony conflicts, and the jury, as the factfinder, was in the best position to resolve conflicts in the testimony and is, therefore, the sole determiner of witness credibility. *See Herbert*, 754 S.W.2d at 144; *Felter*, 837 S.W.2d at 247. Accordingly, we conclude that the jury's finding of negligence was not so against the great weight and preponderance of the

evidence that the finding was clearly wrong and manifestly unjust.

We overrule TIRR's second cross-point.

## Conclusion

We reverse the JNOV and reinstate the jury's verdict for future mental anguish damages in the amount of $625,000. We further remand this cause to the court below for the limited purpose of rendering judgment awarding appellant future mental anguish damages in the amount of $625,000, plus post-judgment interest as allowed by law.

Justice NUCHIA, dissenting.

SAM NUCHIA, Justice, dissenting.

Because there is no evidence in the record to support an award of future mental anguish, I respectfully dissent.

The majority opinion cites *Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788 (Tex. 2006), as changing, by an express holding, the standard of appellate review for legal sufficiency of evidence of future mental anguish damages. In reaching this conclusion, the majority emphasizes that the Supreme Court's majority opinion in *Fifth Club* (1) distinguished *Saenz*[1] and *Parkway*[2] as not involving personal injuries and (2) noted that historically, "some types of disturbing or shocking injuries have been found sufficient to support an inference that the injury was accompanied by mental anguish." *See id.* at 797. There are two problems with the majority's interpretation of *Fifth Club*. First, the *Fifth Club* majority opinion states no *express* holding regarding the standard of review. Second, despite recognizing that disturbing or shocking injuries have warranted a finding of mental anguish, *see id.*, the *Fifth Club*

1. *Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607 (Tex.1996).

2. *Parkway Co. v. Woodruff*, 901 S.W.2d 434 (Tex.1995).

majority opinion does not apply that rule to the issue of *future* mental anguish damages. Instead, the majority opinion relies on the evidence of the nature and duration of the mental anguish and the severity of the injury. *Id.* at 797–98.

In *Fifth Club*, Ramirez, the respondent, and his wife both testified that Ramirez *continued* to have the symptoms of his mental suffering at the time of trial, almost two years after his injury, and that he *continued* to have disruptions in his daily routine. The supreme court stated, "The evidence shows the nature of Ramirez's mental anguish, its *lasting duration*, and the severity of his injuries, and is therefore legally sufficient to support future mental anguish damages." *Id.* The court further stated, "We believe the severe beating received by Ramirez provided an adequate basis for the jury to reasonably conclude that he would continue to suffer substantial disruptions in his daily routine *of the kind described in his and his wife's testimony that he had already suffered in the past.*" *Id.* at 798. (Emphasis added.) Thus the *Fifth Club* majority opinion based its conclusion on the actual *evidence* reflected in the record, not only of the nature of the injury, but also the evidence of the mental anguish related to the injury and its lasting duration. *See id.* The majority opinion did not, therefore, as the majority opinion does here, infer future mental anguish damages from the fact of the injury.

In our case, the witnesses who had current contact with A.B., and therefore were in a position to know of any continuing mental suffering, were her mother, N.N., and her stepfather. Yet, their testimony did not address either A.B.'s present symptoms of mental suffering or the likelihood of her future suffering. N.N.'s testimony regarding A.B.'s fears and sadness related primarily to the period of time that N.N. was in rehabilitation and soon afterwards—a period that terminated approximately four years before trial. N.N. took A.B. to a psychiatrist, Dr. Scott–Gurnell, in March 1999, but testified that A.B.'s last visit with Dr. Scott–Gurnell was on April 11, 2000, two years before trial, and N.N. testified that A.B. had not seen a psychiatrist or psychologist since April 11, 2000. N.N. further testified that A.B. had been living alone since August 2001. A.B.'s stepfather testified that, on the day after A.B.'s alleged assault, she acted the way she did before. He did not testify about any present symptoms of mental suffering.

A.B. did not testify at trial. However, her videotaped deposition, which was taken on December 19, 1999, more than two years before trial, was shown to the jury, and the court reporter transcribed the testimony for the reporter's record. In that deposition, A.B. did not testify about any present mental suffering or any disruption to her daily life that was a result of the assault.

The majority refers to the testimony of Dr. Francisco Perez as supporting an inference of future mental anguish. Dr. Perez was not A.B.'s treating psychologist. He was a neuropsychologist hired by A.B.'s attorney to examine A.B. and to testify regarding his professional opinion of her mental state. According to N.N.'s testimony, confirmed by Dr. Perez, Dr. Perez interviewed A.B. four times: first on December 1, 1997, twice in June 1998, and once in December 1999. Thus, his last examination of A.B. occurred about two and one-half years before trial. Accordingly, his testimony regarding the extent of A.B.'s explicit memory necessarily refers to that time. Dr. Perez did not testify regarding A.B.'s present or continuing mental suffering. Even if Dr. Perez correctly testified that A.B. is "incapable" of traditional therapy, that she cannot ex-

press her emotions clearly, that her improving memory will cause her to remember the assault more, and her implicit memories will not lessen as quickly as her explicit memories, these facts are not evidence of mental anguish, past, present, or future.

Many of the facts stated by the majority are evidence of past mental anguish, for which A.B. has been compensated. There is no evidence, however, to support a finding of or award for future mental anguish. Accordingly, I would affirm the judgment of the trial court.